**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
AARON MATHEW HUGHES,          )
                              )
              Plaintiff,      )
                              )
     v.                       )          1:20CV547
                              )
ANDREW M. SAUL,               )
Commissioner of Social        )
Security,                     )
                              )
              Defendant.      )
```

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff, Aaron Mathew Hughes, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, determining that Plaintiff's entitlement to Supplemental Security Income ("SSI") ended on April 1, 2016. (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entries 8, 12 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 14; <u>see also</u> Docket Entry 11 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for SSI, alleging a disability onset date of September 4, 2006. (<u>See</u> Tr. 483.) Upon denial of that application initially and on reconsideration (<u>see id.</u>), Plaintiff

requested a hearing de novo before an ALJ (see id.). Plaintiff (represented by counsel), his mother LeeAnne Hughes, and a vocational expert ("VE") testified at the hearing. (Tr. 84-115.) On November 8, 2012, the ALJ determined that Plaintiff qualified as disabled under the Act as of September 30, 2010, but recommended a Continuing Disability Review ("CDR") within 24 months. (Tr. 480-90.)

On May 2, 2016, the Social Security Administration ("SSA") sent Plaintiff a Notice of Disability Cessation advising him that, as a result of the CDR which showed medical improvement in his condition, he stopped qualifying for SSI as of April 2016. (Tr. 137-39; see also Tr. 116-34.) Following denials of his challenge to that determination at the reconsideration level (Tr. 135, 140-41, 349-77) and by a Disability Hearing Officer (Tr. 145-54), Plaintiff sought a hearing before an ALJ (Tr. 157).

A new ALJ held a hearing, at which Plaintiff (proceeding through counsel), Plaintiff's mother, and a VE testified. (Tr. 30-83.) The ALJ then determined that Plaintiff's disability ended as of April 1, 2016 (Tr. 9-25), and Plaintiff requested review with the Appeals Council (Tr. 230-33, 318-21). The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

2

In rendering that decision, the ALJ made the following findings:

1. The most recent favorable medical decision finding that [Plaintiff] was disabled is the decision dated November 8, 2012. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, [Plaintiff] had the following medically determinable impairments: epilepsy and anxiety. These impairments were found to result in the residual functional capacity to perform medium work except that he would have been off-task for more than 20% of the workday.

. . .

3. The medical evidence establishes that [Plaintiff] did not develop any additional impairments after the CPD through April 1, 2016. Thus, [Plaintiff]'s current impairments are the same as the CPD impairments.

4. Since April 1, 2016, [Plaintiff] has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. Medical improvement occurred as of April 1, 2016.

. . .

6. . . . [B]eginning on April 1, 2016, [Plaintiff] has had the residual functional capacity to perform medium work . . . except he is capable of occasional work around exposure to bright lights, such as outdoor sunlight but not flashing lights and no fluorescent light with work tasks indoors or indoor lighting can be accommodated with sunglasses. He [] is limited to no climbing of ladders, ropes, or scaffolds as well as no exposure to unprotected heights, moving mechanical parts or hazardous work settings; and no concentrated exposure to extremely hot or humid working environments. He is also limited to simple, routine, and repetitive tasks with

3

the ability to remain on task for two hours at a time
before needing a fifteen minute break throughout a
normal work day with a low level of work pressure defined
as work not requiring multitasking, production rate
pace, assembly line work, or team work to complete a
task. He can understand, remember, and follow simple
instructions; is limited to frequent interaction with
coworkers and supervisors but no more than occasional
interaction with the public; can make simple work-
related decision[s] and adapt to simple and routine
changes in the work setting; and would likely miss work
on an unscheduled basis two times per year.

. . .

7. [Plaintiff]'s medical improvement is related to the
ability to work because it has resulted in an increase
in [Plaintiff]'s residual functional capacity.

. . .

8. Beginning on April 1, 2016, [Plaintiff]'s
impairments has [sic] continued to be severe.

. . .

9. [Plaintiff] has no past relevant work.

. . .

13. Beginning on April 1, 2016, considering [Plaintiff]'s
age, education, work experience, and residual functional
capacity, [Plaintiff] has been able to perform a significant
number of jobs in the national economy.

. . .

14. [Plaintiff]'s disability ended on April 1, 2016,
and [Plaintiff] has not become disabled again since that
date.

(Tr. 13-25 (bold font and internal parenthetical citations

omitted).)

4

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If

5

there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" Hall v.

6

_Harris_, 658 F.2d 260, 264 (4th Cir. 1981) (quoting 42 U.S.C.
§ 423(d)(1)(A)).[1] "To regularize the adjudicative process, the
[SSA] has . . . promulgated . . . detailed regulations
incorporating longstanding medical-vocational evaluation policies
that take into account a claimant's age, education, and work
experience in addition to [the claimant's] medical condition."
_Id._

After a claimant qualifies for benefits under the Act, no
presumption of continuing disability exists, _see_ 42 U.S.C.
§ 423(f)(4); rather, the decision to award benefits remains
subject to a periodic CDR, 20 C.F.R. § 404.1589. The SSA utilizes
the prior determination granting benefits — the CPD — as a
reference to evaluate whether any medical improvement has occurred
relating to the claimant's ability to work. _See_ 42 U.S.C.
§ 423(f); 20 C.F.R. § 404.1594. To make this determination, the
Commissioner employs a seven-step sequential evaluation process
("SEP"):

> 1) Do the claimant's impairments meet or medically equal
> the severity of any listed impairments in 20 C.F.R. Pt.
> 404, Subpt. P, App'x 1?

---

[1] The Act "comprises two disability benefits programs. The Disability Insurance
Benefits Program . . . provides benefits to disabled persons who have
contributed to the program while employed. [SSI] . . . provides benefits to
indigent disabled persons. The statutory definitions and the regulations . . .
for determining disability governing these two programs are, in all aspects
relevant here, substantively identical." _Craig_, 76 F.3d at 589 n.1 (internal
citations omitted).

2) If not, has there been any medical improvement in the severity of the claimant's impairments?

3) If medical improvement has occurred, does such improvement relate to the claimant's ability to work?

4) If no medical improvement has occurred, does an exception apply?

5) If medical improvement relates to the claimant's ability to work, do the claimant's current impairments, singly or in combination, qualify as severe?

6) If severe impairments exist, does the claimant's residual functional capacity ("RFC") permit the performance of past relevant work?

7) If not, does the claimant have the RFC to perform other work existing in significant numbers in the national economy?

20 C.F.R. § 416.994(b)(5).[2] If the Commissioner finds conclusively that a claimant qualifies as disabled at any point in this process, review does not proceed to the next step. See id.

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

---

[2] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

8

1) "[t]he ALJ improperly discounted [Plaintiff's] subjective complaints of medication side effects, contrary to the [SSA]'s regulations and longstanding precedent" (Docket Entry 11 at 6 (bold font and single-spacing omitted));

2) "[t]he ALJ's RFC explanation frustrates meaningful review and is not supported by substantial evidence" (id. at 8 (bold font and single-spacing omitted)); and

3) "[t]he Commissioner failed to his [sic] burden at step five of the [SEP] because he failed to identify and resolve all apparent conflicts of the VE's testimony with the [Dictionary of Occupational Titles ('DOT')]" (id. at 18 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 15 at 15-36.)

## 1. Subjective Complaints of Medication Side Effects

In Plaintiff's first assignment of error, he contends that "[t]he ALJ improperly discounted [Plaintiff's] subjective complaints of medication side effects, contrary to the [SSA]'s regulations and longstanding precedent." (Docket Entry 11 at 6 (bold font and single-spacing omitted).) More specifically, Plaintiff maintains that, by finding that "'the extent of [Plaintiff]'s alleged side effects [we]re not supported by the treatment notes of record'" (id. at 8 (quoting Tr. 20)), the ALJ

9

"'improperly increased [Plaintiff's] burden of proof'" (id. at 7 (quoting Lewis v. Berryhill, 858 F.3d 858, 866 (4th Cir. 2017))) by requiring objective evidence to support his subjective complaints of medication side effects (id. at 8 (citing Tr. 20)). According to Plaintiff, he could "'rely exclusively on subjective evidence to prove' his medication side effects were 'so continuous and/or so severe that [they] prevent[ed] him from working a full eight hour day.'" (Id. (quoting Hines, 453 F.3d at 565 (certain brackets omitted))).) For the reasons discussed below, Plaintiff's contentions lack merit.

Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *5 (Oct. 25, 2017) ("SSR 16-3p") (consistent with the Commissioner's regulations) adopts a two-part test for evaluating a claimant's statements about symptoms. See SSR 16-3p, 2017 WL 5180304, at *3; see also 20 C.F.R. § 416.929. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged

10

symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work. See id. at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

1. Daily activities;

2. The location, duration, frequency, and intensity of . . . symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate . . . symptoms;

11

5. Treatment, other than medication, an individual receives or has received for relief of . . . symptoms;

6. Any measures other than treatment an individual uses or has used to relieve . . . symptoms . . .; and

7. Any other factors concerning an individual's functional limitations and restrictions due to . . . symptoms.

Id. at *7-8.

As an initial matter, Plaintiff overstates the reach of Hines. That case holds only that, at part two of the subjective symptom assessment, "subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability." Hines, 453 F.3d at 563 (emphasis added). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective complaints to find disabling pain at part two of the assessment. However, Hines does not compel ALJs to consider only subjective evidence at part two, as such a requirement would conflict with the regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 20 C.F.R. § 416.929(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from

12

examining and non-examining sources).  As the analysis below details, the ALJ's evaluation of Plaintiff's subjective symptom reporting complies with SSR 16-3p and the applicable regulations.

The ALJ discussed Plaintiff's statements on Disability Reports as well as hearing testimony from Plaintiff and his mother (see Tr. 16-17), specifically noting Plaintiff's assertion that "he has side effects from medication including extreme drowsiness, frequent naps, lapses in thoughts, and difficulty remembering certain things" (id.), as well as that "some of those side effects have gotten worse" (Tr. 17).  The ALJ then found at part one of the subjective symptom analysis that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms" but found, at part two, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not credible to the extent they [we]re inconsistent with the [RFC] assessment for the reasons explained" in the ALJ's decision.  (Tr. 18.)[3]

---

[3] Although not argued by Plaintiff (see Docket Entry 11), the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not <u>credible</u>" (Tr. 18 (emphasis added)) fails to follow SSR 16-3p.  That Ruling "eliminat[ed] the use of the term 'credibility' from . . . sub-regulatory policy, . . . [and] clarif[ied] that subjective symptom evaluation is not an examination of [a claimant]'s character."  SSR 16-3p, 2017 WL 5180304, at *1 (emphasis added).  However, any error by the ALJ in that regard remains harmless under the circumstances of this case.  <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").  Despite the ALJ's use of the term "credible" in his finding quoted above (Tr. 18), at the outset of the RFC analysis, the ALJ stated that he had "considered all symptoms and <u>the</u>

The ALJ provided the following analysis to support his part two finding:

> [Plaintiff] essentially argues ongoing disability due to side effects from his medication – including primarily fatigue and memory difficulties. He reported that he requires a <u>three-hour nap daily</u> – about six days out of seven – despite sleeping almost twelve hours at night.
>
> The record, however, documents medical improvement in his condition since April 2016. . . . He acknowledged . . . that he was able to stop several medications . . . .
>
> After the vagal nerve stimulator was installed, his medications changed. As the stimulator was adjusted for optimal therapy, his medications continued to be reduced. . . .
>
> Given this medication history, the alleged side effects of drowsiness and difficulty concentration [sic] were supported in 2012 by the prior ALJ's finding of 20% off task as well as medical opinions the ALJ relied upon. However, since the vagal nerve stimulator and beginning Aptiom, it is reasonable to expect that the severity of the side effects has decreased.
>
> <u>It is noteworthy that [Plaintiff] has generally taken the same dosage of [c]lonazepam and Vimpat since at least 2013. His dosage of Aptiom was reduced in January 2015 and has remained at the same level</u>. . . . [I]t is notable that from a historical perspective, there is nothing mentioned in the primary care progress notes of side effects or drowsiness from these two medications.

---

extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of . . . <u>SSR 16-3p</u>" (Tr. 16 (emphasis added)). Moreover, in other material portions of his subjective symptom analysis, the ALJ adhered to SSR 16-3p's requirement that such analysis focus on "the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [claimant's] record." SSR 16-3p, 2017 WL 5180304, at *2 (emphasis added). For example, in analyzing Plaintiff's subjective reports of medication side effects, the ALJ stated that Plaintiff's "alleged drowsiness [wa]s <u>not consistent</u> with the treatment note from March 2016." (Tr. 19 (emphasis added).)

Similarly, when Aptiom was added, nothing is noted other than he was "doing well" or having "no side effects."

If his side effects were as limiting as claimed, it would be reasonable to expect that he would have informed his treating physician who would then note it and make adjustments to the type or quantity of medication taken. If side effects were as severe as alleged, it is also reasonable to expect that his physician would observe drowsiness during visits. However, there is no indication in the treatment notes of constant drowsiness or other apparent side effects. While his treatment provider noted side effects in Exhibits B10F and B11F, they are not fully supported by his own progress notes where side effects are not mentioned. In fact, all the physical examinations and mental status examinations show normal language and cognition. It is also noteworthy that [Plaintiff]'s alleged drowsiness is not consistent with the treatment note from March 2016 where there was a single complaint of insomnia.

The only other side effect noted included dizziness. It was initially noted in December 2016, but by March 2017 [Plaintiff] reported only "one episode of rare dizziness." After that, there was no further mention of it to his primary care provider, which suggests it resolved. . . .

In sum, the extent of [Plaintiff]'s side effects are not supported by the treatment notes of record.

(Tr. 18-20 (emphasis added) (internal parenthetical citations omitted).)[4]

---

[4] After considering and weighing the opinion evidence of record (see Tr. 20-23), the ALJ reiterated and summarized his analysis of Plaintiff's subjective reports of medication side effects:

> [W]hile [Plaintiff] reports ongoing debilitating side effects, the primary care records do not document reports of limitations to the extent as alleged. If his side effects were as limiting as claimed, it would be reasonable to expect that he would have informed his treating physician who would then note it and make adjustments to the type or quantity of medication taken. However, as noted above,

15

As the above-quoted and -emphasized discussion makes clear, in analyzing the extent of Plaintiff's reported medication side effects, the ALJ relied on factors other than purely objective medical evidence. (See Tr. 18-19, 23.) In that regard, the ALJ properly considered 1) the duration, frequency, and intensity of Plaintiff's side effects, 2) the type, dosage, and effectiveness of medication taken by Plaintiff, expressly observing that the dosage had remained the same despite Plaintiff's reports of severe side effects; and 3) measures other than treatment Plaintiff used to relieve the side effects, i.e., daily naps. (Id.) The ALJ also discussed and relied upon the absence of any reports by Plaintiff to his treating physicians of drowsiness or problems with his memory (id.), which does not constitute objective evidence, but rather, subjective evidence of Plaintiff's statements (or lack thereof) to his medical providers.

In short, because the ALJ did not solely rely on the lack of objective evidence to support Plaintiff's subjective reports of medication side effects, but properly considered such evidence along with other permissible factors, Plaintiff's first assignment of error fails as a matter of law.

---

[Plaintiff] has been maintained on generally the same dosage of medication for some time.

(Tr. 23 (emphasis added).)

16

## 2. RFC

Next, Plaintiff argues that "[t]he ALJ's RFC explanation frustrates meaningful review and is not supported by substantial evidence." (Docket Entry 11 at 8 (bold font and single-spacing omitted).) In particular, Plaintiff challenges the ALJ's RFC analysis on four grounds: 1) "[t]he ALJ cherrypicked facts . . . that support a finding of nondisability while ignoring evidence that points to a disability finding" (id. at 9 (bold font and single-spacing omitted)); 2) "[t]he ALJ failed to adhere to the [SSA]'s 'treating physician rule' and failed to adequately explain how he weighed the opinion evidence" from Plaintiff's treating neurologist, Dr. Andrew S. Braunstein (id. at 12 (bold font and single-spacing omitted)); 3) "[t]he ALJ failed to build an accurate and logical bridge from the evidence to his conclusion" (id. at 16 (bold font and single-spacing omitted)); and 4) "[t]he ALJ failed to explain the meaning of 'production rate pace' work, which frustrates meaningful review" (id. at 17 (bold font and single-spacing omitted)). Those arguments fail to establish an entitlement to relief.

### a. Cherry-Picking Evidence

Plaintiff first faults the ALJ for "cherrypick[ing] facts . . . that support a finding of nondisability while ignoring evidence that points to a disability finding." (Id. at 9 (bold

17

font and single-spacing omitted).) In particular, Plaintiff claims that the ALJ 1) "ignored evidence provided by [Plaintiff] and his mother" regarding the impact of his seizures and medication side effects on his ability to function (id. at 10 (citing Tr. 41-42, 44-45, 63, 65, 67-68, 282-85, 287)), 2) "ignored evidence from [Plaintiff's] primary care provider, Dr. James W. McNabb, [] which stated [Plaintiff's] condition was worsened by being in public, hot weather, extertion [sic], sunlight, and lack of sleep" (id. (citing Tr. 405)), 3) "failed to consider evidence from [Dr. Braunstein]" concerning Plaintiff's functional restrictions (id. at 10-11 (citing Tr. 379, 388, 477)), and 4) "failed to properly account for the opinions of the consultative examiners, Dr. Gregory A. Villarosa[ ] and Dr. Bonny Gregory[ ]" (id. at 11 (citing Tr. 327, 349-50)). Plaintiff's contentions fall short.

    i.  Statements from Plaintiff and his Mother

    Plaintiff maintains that, in determining the RFC, the ALJ "ignored" certain statements by Plaintiff at the hearing and by his mother on a Third Party Function Report. (Id. at 10 (citing Tr. 41-42, 44-45, 63, 65, 67-68, 282-85, 287).) That argument glosses over the fact that the ALJ discussed Plaintiff's statements on Disability Reports as well as his hearing testimony in detail (see Tr. 16-17), but discounted those statement as not fully borne out by the record (see Tr. 18), a finding that, as discussed above,

the ALJ supported with substantial evidence. Plaintiff's contention also overlooks that the ALJ discussed both Plaintiff's mother's testimony at the hearing (see Tr. 17), as well as her statements on the Third Party Function Report (see Tr. 21), but assigned those statements "little weight" (id.), a finding unchallenged by Plaintiff (see Docket Entry 11). Moreover, given the extensive restrictions in the RFC, including limitations involving exposure to certain kinds of light, heat and humidity, heights, and moving machinery, as well as an allowance to wear sunglasses indoors and limits to simple, routine, and repetitive tasks ("SRRTs") and on interaction with others (see Tr. 15-16), Plaintiff has not shown how a remand for the ALJ to further discuss the statements in question would result in greater restrictions in the RFC, let alone to a favorable outcome in his case. See generally Bishop v. Commissioner of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) ("[A]ny error is reviewed under the harmless error doctrine."); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

ii. Evidence from Dr. McNabb

Plaintiff next accuses the ALJ of "ignor[ing] evidence" from Dr. McNabb "which stated [Plaintiff's] condition was worsened by being in public, hot weather, extertion [sic], sunlight, and lack of sleep." (Docket Entry 11 at 10 (citing Tr. 405).) As a threshold matter, the evidence at issue from Dr. McNabb, located in the History of Present Illness ("HPI") portion of a treatment note, does not constitute his <u>opinion</u> regarding functional restrictions arising from Plaintiff's seizures and/or medication side effects, but rather reflects Plaintiff's own statements to Dr. McNabb regarding aggravating factors for his seizures. (<u>See</u> Tr. 405.) Furthermore, as the RFC contains an exertional restriction to medium work, as well as limitations on interaction with the public and on exposure to hot weather and sunlight (<u>see</u> Tr. 15-16), Plaintiff has failed to demonstrate how remanding for the ALJ to discuss this evidence would lead to a more favorable result in his case. <u>See generally</u> <u>Bishop</u>, 583 F. App'x at 67 ("[A]ny error is reviewed under the harmless error doctrine."); <u>Fisher</u>, 869 F.2d at 1057 (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

iii. Opinions from Dr. Braunstein

Plaintiff additionally contends that "the ALJ failed to consider evidence from [Dr. Braunstein] that [Plaintiff's] inability to maintain substantial gainful employment was 'not just related to seizures' but also due to 'side effects from medication and other,' [that] 'he is limited in activity [in] that he cannot drive, operate heavy machinery, engage in activities which require heights and other,' and [that he] 'has many side effects from his epilepsy medications.'" (Docket Entry 11 at 10-11 (citing Tr. 379, 388, 477).) Again, Plaintiff fails to acknowledge that the ALJ expressly considered and assigned "little weight" to Dr. Braunstein's opinions that Plaintiff remained "'incapable of maintaining gainful employment'" and "'limited in activity, cannot drive, operate heavy machinery, or engage in activities that require heights'" (Tr. 22 (quoting Tr. 388)), as well as to Dr. Braunstein's opinion that Plaintiff's medication side effects left him "'disabled'" from any kind of work (id. (quoting Tr. 488)). As discussed in more detail below, the ALJ did not err in his evaluation of Dr. Braunstein's opinions. Moreover, Plaintiff's argument ignores the fact that the RFC crafted by the ALJ already precludes exposure to moving mechanical parts and unprotected heights (see Tr. 15) and thus Plaintiff has not shown how remand for additional discussion of Dr. Bronstein's opinions would change

21

the outcome of his case. <u>See generally</u> <u>Bishop</u>, 583 F. App'x at 67 ("[A]ny error is reviewed under the harmless error doctrine."); <u>Fisher</u>, 869 F.2d at 1057 (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

 iv. Opinions from Dr. Villarosa

 Plaintiff also challenges the ALJ for "fail[ing] to properly account for Dr. Villarosa's opinion" that Plaintiff "'was quite slow regarding pace of tasks" and "'would likely have some difficulty handling the stress and pressures associated with day-to-day work activity.'" (Docket Entry 11 at 11 (quoting Tr. 327).) Plaintiff neglects to recognize that, in rating Plaintiff's degree of limitation in concentration, persistence, or pace, the ALJ explicitly acknowledged that, "[o]n consultative examination, [Plaintiff] did perform tasks more slowly, but had not [sic] apparent issues with concentration" and that "treatment notes d[id] not consistently document any observed deficits in concentration or maintaining pace." (Tr. 15.) Plaintiff makes <u>no</u> attempt to explain why the ALJ's restrictions to SRRTs "with the ability to <u>remain on task for two hours at a time</u> before needing a fifteen minute break throughout a normal work day with a <u>low level of work pressure</u> defined as work not requiring multitasking,

22

production rate pace, assembly line work, or team work to complete a task" (Tr. 15-16), as well as to "simple instructions," "simple work-related decision[s]," and "simple and routine changes in the work setting" (Tr. 16) would not sufficiently account for Dr. Villarosa's opinions regarding Plaintiff's abilities to maintain pace and handle work pressures. That failure precludes relief on this front. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

v. Opinions from Dr. Gregory

Lastly (on this front), Plaintiff asserts that "[t]he ALJ [] failed to properly account for Dr. Gregory's opinion that [Plaintiff] was moderately limited in his ability to understand and remember detailed instructions and carry out detailed instructions; make simple work-related decisions; . . . complete [a] work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Docket Entry 11 at 11 (citing Tr. 349-50).) Plaintiff's argument

23

brushes aside the fact that, despite finding moderate limitation in those areas (see Tr. 349-50), Dr. Gregory nevertheless concluded that Plaintiff remained "capable of [SRRTs] in [a] low stress, low production setting with limited social interactions" (Tr. 365). The ALJ accorded "great weight" to Dr. Gregory's opinions, expressly noting that, despite finding moderate limitations in Plaintiff's abilities to maintain social functioning and concentration, persistence, or pace, Dr. Gregory opined that Plaintiff could "perform [SRRTs] in a low stress, low production setting with limited social interactions." (Tr. 22 (referencing Tr. 363, 365).) Significantly, the ALJ included all of those restrictions in the RFC. (See Tr. 15-16.)

b. <u>Dr. Braunstein's Opinions</u>

Plaintiff next argues that "the ALJ [] improperly failed to give the opinion of [Dr. Braunstein] controlling weight as required by the [SSA]'s regulations and longstanding precedent." (Docket Entry 11 at 13 (citing Tr. 22).) The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. See 20 C.F.R. § 416.927(c) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from

24

the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. § 416.927(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. See 20 C.F.R. § 416.927(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added).

Dr. Braunstein observed, at the end of a treatment note dated March 16, 2017, that Plaintiff remained "limited in activity" and could not "drive, operate heavy machinery, engage in activities which require heights and other," as well as that Plaintiff could not "maintain[] gainful employment." (Tr. 388.) Shortly thereafter, Dr. Braunstein dated a "To Whom It May Concern" letter October 17, 2018, in which he opined that Plaintiff "ha[d] many side effects from his epilepsy medications" and that his

25

"refractory seizures and medication side effects leave him disabled from any kind of work." (Tr. 477.) On January 24, 2019, Dr. Braunstein completed a pre-printed form entitled "Seizures Medical Source Statement" ("MSS") (Tr. 478-79) on which he opined that Plaintiff had convulsive, grand mal seizures on average once per month and that, following those seizures, Plaintiff experienced confusion, severe headaches, muscle strain, exhaustion, and difficulties communicating for approximately six hours (see Tr. 478). Dr. Braunstein listed Plaintiff's medication side effects as dizziness, eye focusing problems, and coordination disturbance. (See id.) As a result of Plaintiff's medication side effects and "unpredictable" seizures, Dr. Braunstein concluded that Plaintiff could not work. (Tr. 479.)

The ALJ accorded Dr. Braunstein's opinions "little weight" based upon the following rationale:

> The [ALJ] has [] given little weight to Dr. Braunstein's opinion found in Exhibit B9F [(Tr. 388)] – that [Plaintiff] is "incapable of maintaining gainful employment" and that he is "limited in activity, cannot drive, operate heavy machinery, or engage in activities that require heights." While Dr. Braunstein is a treating doctor and a specialist, he did not provide an opinion as to [Plaintiff]'s function by function limitations. Additionally, there is no evidence that the provider has performed functional testing, and it is unclear if his opinion is based on symptoms reported to him or clinical examinations. His opinion that [Plaintiff] is "incapable of maintaining gainful employment" is conclusory and an opinion on an issue ultimately reserved for the Commissioner. Further, the provider does not clarify whether limitations are due to

seizures or side effects of medication. It also appears
that the opinion was prompted by [Plaintiff]'s mother
telling the provider that a disability evaluation was
upcoming. . . .

The [ALJ] has also given little weight to Dr.
Braunstein's opinion found in Exhibit B10F [(Tr. 477)].
While it is an opinion from a treating provider and
specialist, Dr. Braunstein does not list or state what
side effects cause [Plaintiff] to be "disabled" or
document whether such side effects were clinically
noted. There is also no evidence this provider performed
any functional testing and the provider did not provide
an assessment of [Plaintiff]'s function by function
limitations. It is also unclear if the opinion is based
on symptoms reported to the provider or a clinical
examination. The opinion that [Plaintiff] is "disabled
from any kind of work" is also an opinion on an issue
reserved for the Commissioner. It is also not consistent
with the medical evidence of record and testimony
showing [Plaintiff]'s seizures have reduced to occurring
only once to twice per year and Dr. Braunstein's
treatment records that show stable, improved condition,
and no recent mention of adverse side effects.

As for Dr. Braunstein's opinion found in Exhibit B11F
[(Tr. 478-79)], while this is an opinion from a treating
provider and specialist, he did not identify what
specific side effects would cause limitations. There is
also no evidence of functional testing in this regard
and Dr. Braunstein did not provide a function by function
assessment of [Plaintiff]'s limitations. It is also
unclear if the opinion is based on reported symptoms or
clinical examinations. The opinion that [Plaintiff]
"can't work" is also an opinion on an issue ultimately
reserved for the Commissioner. Additionally, the
opinion that [Plaintiff] has one seizure per month is
inconsistent with the testimony and other medical
evidence that indicates [Plaintiff] has had more like
one to two seizures per year. Some weight has been
attributed to the opinion in regard to the need for
[Plaintiff] to avoid hazards and heights and the period
of post-seizure recovery of six to seven hours. To

account for these limitations, the [ALJ] found [Plaintiff] would miss work two days per year.

(Tr. 22-23 (internal parenthetical citations omitted).)

Plaintiff first faults the ALJ for discounting Dr. Braunstein's opinions that Plaintiff qualified as disabled and/or could not work as matters reserved to the Commissioner, arguing that the ALJ must still "consider" such opinions. (Docket Entry 11 at 14 (citing Social Security Ruling 06-03p, <u>Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies</u>, 2006 WL 2329939, at *6 (Aug. 9, 2006) ("SSR 06-03p"), for the proposition that the SSA must "'evaluate all the evidence in the case record that may have a bearing on [their] determination or decision of disability . . . by other nongovernmental agencies'" and that "'evidence of a disability decision by another governmental or **nongovernmental agency** cannot be ignored and must be considered'" (bold font added by Plaintiff)).)

That argument fails for two reasons. First, Dr. Braunstein constitutes neither a "governmental" nor a "nongovernmental agency" and thus the quoted passage from SSR 06-03p lacks applicability to his opinions. Second, and more significantly, the ALJ did provide other reasons for discounting Dr. Braunstein's opinions that Plaintiff qualified as disabled and/or could not

28

work – the ALJ noted that "[t]he opinion that [Plaintiff] is 'disabled from any kind of work' . . . is <u>also</u> not consistent with the medical evidence of record and testimony showing [Plaintiff]'s seizures have reduced to occurring only once to twice per year and Dr. Braunstein's treatment records that show stable, improved condition, and no recent mention of adverse side effects."  (Tr. 22 (emphasis added).)

Plaintiff additionally objects that the ALJ discredited Dr. Braunstein's opinions because they lacked function by function limitations, arguing that his "opinion clearly outlines the following functional limitations: 'cannot drive, operate heavy machinery, engage in activities which require heights.'" (Docket Entry 11 at 14 (quoting Tr. 388).)  However, although Dr. Braunstein's March 2017 opinion did contain such limitations (two of which the ALJ incorporated into the RFC (<u>see</u> Tr. 15-16)), Dr. Braunstein did not provide an opinion regarding the impact of Plaintiff's seizures and medication side effects on Plaintiff's abilities to engage in exertional activities such as lifting, carrying, pushing, pulling, sitting, standing, or walking, postural activities such as balancing, stooping, kneeling, crouching, or crawling, and manipulative activities such as handling, fingering, or reaching.  (<u>See</u> Tr. 388, 477, 478-79.)

29

Regarding the ALJ's rationale that Dr. Braunstein's opinions lacked clarity as to whether "the opinion [wa]s based on reported symptoms or clinical examinations" (Tr. 23), Plaintiff observes that "there is no requirement that an opinion specifically state which aspects are based on subjective complaints, clinical examination or both" (Docket Entry 11 at 14). Although the regulations do not <u>require</u> medical providers to explicitly categorize their opinions as reflecting clinical findings versus a patient's subjective reports, controlling precedent and the regulations make abundantly clear that, "if a physician's opinion is not supported by clinical evidence[,] . . . it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 590; <u>see also</u> 20 C.F.R. § 416.927(c)(2)-(4). Thus, to the extent Dr. Braunstein did not clarify whether he based his opinions on Plaintiff's subjective symptom reports, the ALJ did not err in citing such lack of clarity as one factor among many in his decision to discount Dr. Braunstein's opinions. <u>See Bishop</u>, 583 F. App'x at 67 (affirming ALJ's rejection of medical opinion because that opinion "appeared to mirror [the claimant]'s subjective statements" and conflicted "with the mild to moderate diagnostic findings, the conservative nature of [the claimant]'s treatment, and the generally normal findings during physical examinations").

Plaintiff further takes issue with "the ALJ's suggestion that Dr. Braunstein only stated [his March 2017] opinion because [Plaintiff's] mother suggested [Dr. Braunstein] do so," deeming such a rationale "without merit, conjecture, and frustrat[ing to] meaningful review." (Docket Entry 11 at 14 (emphasis added) (citing Tr. 22, 388).) The ALJ, in fact, did not find that Dr. Braunstein "only" offered his March 2017 opinion because Plaintiff's mother requested he do so. Rather, the ALJ merely noted, as one consideration among many others, that the report of Plaintiff's mother to Dr. Braunstein on March 16, 2017, that Plaintiff's "disability evaluation [wa]s coming up for review" (Tr. 388) appeared to prompt Dr. Braunstein's disability opinion at the conclusion of that treatment note. (Tr. 22.) An ALJ may permissibly consider whether a claimant solicited a disability opinion in support of his or her benefits claim as one factor among others in weighing the opinion. See Hinton v. Massanari, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that ALJ may "question a doctor's credibility" when the claimant's counsel solicited the opinion, but "may not automatically reject the opinion for that reason alone"); Berry-Hobbs v. Colvin, No. 1:15CV01103, 2016 WL 4621080, at *9 (M.D.N.C. Sept. 6, 2016) (unpublished) ("So long as the ALJ relies on other factors in addition to the source of the examination to support his or her decision to discount the

31

opinion in question, the ALJ does not commit error."), <u>recommendation adopted</u>, 2016 WL 5922312 (M.D.N.C. Oct. 11, 2016) (unpublished) (Schroeder, J.); <u>McCummings v. Colvin</u>, No. CIV.A. 5:12-3315, 2014 WL 108356, at *13 (D.S.C. Jan. 10, 2014) (unpublished) (finding no error where ALJ stated that "combination of [] factors" caused him to discount physician's opinion, and ALJ did not discount the opinion merely because counsel solicited it), <u>aff'd sub nom.</u>, <u>McCummings v. Commissioner of Soc. Sec. Admin.</u>, 585 F. App'x 28 (4th Cir. 2014).

   c. <u>Accurate and Logical Bridge</u>

   Plaintiff also attacks the ALJ's RFC analysis by asserting that, "similar to *Monroe[ v. Colvin*, 826 F.3d 176, 189-90 (4th Cir. 2017)], the ALJ [] failed to build an accurate and logical bridge from the evidence to his conclusion that [Plaintiff's] medication side effects are not as severe as alleged." (Docket Entry 11 at 16.) In particular, Plaintiff faults the ALJ for 1) "assert[ing] that [Plaintiff's] medication side effects [we]re not documented" in the record "because . . . Dr. Braunstein[] did note his medication side effects on several occasions" (<u>id.</u> at 17 (citing Tr. 379, 388, 390, 477, 479)), and 2) "inserti[ng the ALJ's] own opinion as to what action by [Plaintiff's] physician would have been 'reasonable' regarding the medications" as

"[im]proper and frustrat[ing to] meaningful review" (id. (citing Tr. 23)).  Neither of those assertions carries the day.

Plaintiff's contention that "Dr. Braunstein[] did note his medication side effects on several occasions" (id. at 17 (citing Tr. 379, 388, 390, 477, 479)) falls short.  The ALJ explained that Plaintiff "essentially argue[d] ongoing disability due to side effects from his medication – including primarily fatigue and memory difficulties" (Tr. 18 (emphasis added)), but found that, "[i]f side effects were as severe as alleged, it [wa]s [] reasonable to expect his physician would observe drowsiness during visits," but that "there [wa]s no indication in the treatment notes of constant drowsiness," and that "all the physical examinations and mental status examinations show[ed] normal language and cognition" (Tr. 19). Consistent with that analysis, the transcript pages upon which Plaintiff relies do not document drowsiness or fatigue as a medication side effect but rather contain only generic mentions of "side effects from medication" (Tr. 379; see also Tr. 477 (asserting Plaintiff "has many side effects from his epilepsy medications"), 479 (listing "[side effects] from meds" as among "limitation that would affect [Plaintiff]'s ability to work at a regular job on a sustained basis")), or list the side effects as "dizziness and other" (Tr. 388 (emphasis added)) or "several bouts of dizziness of unclear etiology" (Tr. 390 (emphasis added)).

33

Indeed, Dr. Braunstein noted on his MSS that Plaintiff's medication side effects included "[d]izziness," "[e]ye focusing problems," and "[c]oorindation disturbance," and did <u>not</u> check the boxes for "[l]ethargy" and "[l]ack of alertness." (Tr. 478.) Under such circumstances, Plaintiff has not shown that the ALJ erred by finding that the record failed to support Plaintiff's claim of disabling drowsiness and memory problems from his medications.

Plaintiff's argument that the ALJ erred by "inserti[ng ] his own opinion as to what action by [Plaintiff's] physician would have been 'reasonable' regarding the medications" (Docket Entry 11 at 17 (citing Tr. 23)) fares no better. Given that the pre-printed MSS form expressly asked Dr. Braunstein to indicate which side effects Plaintiff experienced from his epilepsy medications, and pre-printed boxes existed for "[l]ethargy," "[l]ack of alertness," and "[o]ther" (with a space to write-in a side effect not otherwise listed) <u>which Dr. Braunstein did not check</u> (Tr. 478), the ALJ did not err by observing that, "[i]f side effects were as severe as alleged, it [wa]s [] reasonable to expect his physician would observe drowsiness during visits," but that "there [wa]s no indication in the treatment notes of constant drowsiness" (Tr. 19).

d.   <u>Production Rate Pace</u>

Plaintiff next maintains that the ALJ erred by using the term 'production rate pace' in [Plaintiff's] RFC evaluation, but fail[ing] to explain what the term means." (Docket Entry 11 at 18 (citing <u>Thomas v. Berryhill</u>, 916 F.3d 307, 312 (4th Cir. 2019) (holding that phrase "production rate or demand pace" did not qualify as "especially common – certainly not common enough for [the court] to know what mean without elaboration")).) However, a review of recent decisions from the United States Court of Appeals for the Fourth Circuit addressing non-production restrictions bolsters the conclusion that the ALJ sufficiently explained the meaning of the phrase "production rate pace" to permit meaningful judicial review.

As another judge of this Court recently reasoned:

In [<u>Perry v. Berryhill</u>, 765 F. App'x 869 (4th Cir. 2019)], the Fourth Circuit found fault with "the ALJ's reference to a 'non-production oriented work setting,'" as the Fourth Circuit "d[id] not know what the ALJ intended when she used that phrase," making it "difficult, if not impossible, to evaluate whether restricting [the plaintiff] to a 'non-production oriented work setting' properly accounted for [his] well-documented limitations in concentration, persistence, or pace." <u>Perry</u>, 765 F. App'x at 872. In so doing, the Fourth Circuit specifically distinguished its decision in <u>Sizemore v. Berryhill</u>, 878 F.2d 72 (4th Cir. 2017), where it "found that an ALJ had adequately explained a[n RFC] assessment that restricted the claimant, in part, to 'non-production jobs,'" as "the ALJ in <u>Sizemore</u> provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or

35

'public contact,' to account for moderate limitations in concentration, persistence, or pace," which "<u>descriptors helped to explain the restriction intended by the ALJ</u>, and allowed [the Fourth Circuit] to evaluate whether that restriction adequately accounted for the claimant's limitations." <u>Perry</u>, 765 F. App'x at 872 n.1.

<u>Ross v. Berryhill</u>, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C. Mar. 29, 2019) (unpublished) (Schroeder, C.J.) (emphasis added); see also <u>Thomas</u>, 916 F.3d at 312 (finding that ALJ's preclusion of "work 'requiring a production rate or demand pace'" and "'crisis situations, complex decision making, or constant changes in a routine setting'" did not suffice under facts of that case). As in <u>Ross</u> (and consistent with <u>Sizemore</u>, as construed in <u>Perry</u>), the ALJ here defined "a low level of work pressure" to mean work requiring no "multitasking, production rate pace, assembly line work, or team work to complete a task," and provided the further descriptors of "simple instructions," "simple work-related decisions," "simple and routine changes in the work setting," as well as "frequent interaction with coworkers and supervisors" and "no more than occasional interaction with the public" (Tr. 15-16). Those descriptors "help[] to explain the restriction intended by the ALJ, and allow[ the Court] to evaluate whether that restriction adequately accounted for [Plaintiff's] limitations," <u>Perry</u>, 765 F. App'x at 872 n.1.

In sum, Plaintiff's second issue on review fails as a matter of law.

### 3. Conflicts Between VE and <u>DOT</u>

In his third and final assignment of error, Plaintiff contends that "[t]he Commissioner failed to his [sic] burden at step five of the [SEP] because he failed to identify and resolve all apparent conflicts of the VE's testimony with the [<u>DOT</u>]." (Docket Entry 11 at 18 (bold font and single-spacing omitted).) In that regard, Plaintiff asserts that "the VE note[d] several conflicts[] which the ALJ failed to properly resolve" (<u>id.</u> (citing Tr. 80-81)), as well as that "the jobs [cited by the VE and adopted by the ALJ at step five] require the use of machinery and equipment or working around machinery and equipment" (<u>id.</u> (citing <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>"), No. 311.677-018 ("Dining Room Attendant"), 1991 WL 672696 (G.P.O 4th ed. rev. 1991), <u>DOT</u>, No. 761.684-026 ("Polisher"), 1991 WL 680432, <u>DOT</u>, No. 389.683-010 ("Sweeper-Cleaner, Industrial"), 1991 WL 673279)) in contravention of the RFC's preclusion of "exposure to moving mechanical parts" (Tr. 15). According to Plaintiff, "the ALJ failed to ask the VE any follow up questions as to how these conflicts m[ight] impact the numbers of these jobs that would be available for a claimant like [Plaintiff]." (Docket Entry 11 at 18 (citing Tr. 79-81).) Those contentions fail on both fronts.

Social Security Ruling 00-4p, <u>Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational</u>

37

*Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p"), places an affirmative duty on an ALJ to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [DOT]. When there is an apparent unresolved conflict between VE . . . evidence and the [DOT], the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added). "[A]n ALJ has not fulfilled his affirmative duty merely because the [VE] responds 'yes' when asked if her testimony is consistent with the [DOT]," Pearson v. Colvin, 810 F.3d 204, 208 (4th Cir. 2015) (internal quotation marks omitted); thus, "[t]he ALJ independently must identify . . . where the [VE's] testimony seems to, but does not necessarily, conflict with the [DOT]," id. at 209 (emphasis added); see also id. (rejecting the Commissioner's argument that "apparent" conflict meant only "obvious" one).

Here, the ALJ asked the VE whether her opinion remained "consistent with the [DOT] and its companion publication, the [Selected Characteristics of Occupations Defined in the Revised

38

<u>Dictionary of Occupational Titles</u> ('<u>SCO</u>')]," to which the VE responded as follows:

> Yes, sir, your honor. With the exception of such characteristics as an individual being off task, interacting with coworkers and supervisors, unscheduled absences, and individual multitasking, production rate pace, an individual remaining on task, breaks, accommodations with sunglasses, as well as the references to exposure to light, outdoor sunlight, fluorescent light, flashing lights. Those characteristics are not mentioned or cited in the [<u>DOT</u>] or supplement publications, but the information that I provided in regards to those characteristics is based on a reasonable degree of vocational certainty that is a result of my education and training, and also experience with employers, job search, and placement.

(Tr. 80-81.)

As the above-quoted testimony makes clear, the VE did <u>not</u> testify that <u>conflicts</u> existed between her testimony and the <u>DOT</u> (or <u>SCO</u>) with respect to subject areas at issue, but rather that the <u>DOT</u> (and <u>SCO</u>) <u>did not address</u> such subjects, such that the VE based her testimony that the jobs she cited could accommodate restrictions in those areas on her "education and training, and also experience with employers, job search, and placement." (Tr. 81.) Thus, the ALJ did not fail to identify and resolve any apparent conflicts in those areas. <u>See</u> <u>Burns v. Barnhart</u>, 312 F.3d 113, 128 (3d Cir. 2002) (noting that, because <u>DOT</u> does not address aptitude levels, <u>DOT</u> and VE testimony "w[ere] not necessarily inconsistent in this regard, so the duty on the part of the ALJ to inquire into conflicts did not arise"); <u>Finnegan v.</u>

39

_Berryhill_, No. 1:16CV1012, 2017 WL 2224332, at *6 (M.D.N.C. May 19, 2017) (unpublished) ("[T]he mere silence of the DOT on a matter does not create, per se, an apparent conflict between the VE's testimony and the DOT."), recommendation adopted, slip op. (M.D.N.C. June 16, 2017) (Schroeder, J.); _Manley v. Colvin_, No. ED CV 16-1179-E, 2016 WL 7191541, at *4 (C.D. Cal. Dec. 12, 2016) (unpublished) ("There is no obvious or apparent conflict between the [DOT] and a [VE's] testimony that a particular job can accommodate a sit/stand option.  To hold otherwise would mean that [VEs] always create conflicts with the [DOT] whenever they mention any of the multitude of things about a job not expressly addressed in the [DOT]." (internal citation, quotation marks, and brackets omitted)).  Moreover, the DOT flatly contradicts Plaintiff's unsupported argument that the jobs cited by the VE and adopted by the ALJ at step five "require the use of moving machinery or equipment" (Docket Entry 11 at 18) – each job listing in the DOT reflects the following entry: "Moving Mech. Parts: Not Present – Activity or condition does not exist."  DOT, No. 311.677-018 ("Dining Room Attendant"), 1991 WL 672696; DOT, No. 761.684-026 ("Polisher"), 1991 WL 680432; DOT, No. 389.683-010 ("Sweeper-Cleaner, Industrial"), 1991 WL 673279 (emphasis added).

Put simply, Plaintiff has not shown entitlement to relief with regards to this assignment of error.

40

### III. CONCLUSION

Plaintiff has not established any errors warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

May 28, 2021